=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 203
Strauss Painting, Inc.,
         Appellant-Respondent,
         v.
Mt. Hawley Insurance Company,
         Respondent-Appellant,
Metropolitan Opera Association,
Inc.,
         Respondent.


         Richard Janowitz, for appellant-respondent.
         Clifton S. Elgarten, for respondent-appellant.
         William J. Mitchell, for respondent.


PER CURIAM:

         By agreement dated September 3, 2008, Strauss Painting,

Inc. (Strauss)/Creative Finishes, Ltd. (Creative) contracted with

the Metropolitan Opera Association, Inc. (the Met) to perform

work on the Met's premises; specifically, to strip and repaint

the rooftop steel carriage track for the opera house's automated

- 1 -

window-washing equipment (hereafter, generally referred to as the contract). The contract was a tailored version of the American Institute of Architects' "Abbreviated Form of Agreement Between Owner and Contractor For CONSTRUCTION PROJECTS OF LIMITED SCOPE where the Basis of Payment is a STIPULATED SUM" (AIA Document A107 [1978 ed]), with the parties' attached Exhibits A through D made a part thereof. The first page of the contract designates the Met as "the Owner" and Strauss/Creative as "the Contractor."

## I.

### Indemnification and Insurance Requirements

The contract mandates that Strauss/Creative indemnify and hold the Met harmless, "[t]o the fullest extent permitted by law," from and against all claims and damages attributable to bodily injuries "arising out of or resulting from" work performed by Strauss/Creative or any of its subcontractors "caused in whole or in part by [their] negligent act or omission," and "regardless of whether or not . . . caused in part by [the Met]." The contract's provisions addressing insurance obligate Strauss/Creative to purchase and maintain contractors liability insurance to protect the Met from claims under workers' compensation and other employee benefit acts, and "claims for damages because of bodily injury . . . which may arise out of or result from [Strauss/Creative's] operations" under the contract, whether undertaken by Strauss/Creative, any of its subcontractors

or "anyone directly or indirectly employed by any of them." Additionally, the insurance "shall include contractual liability insurance" applicable to Strauss/Creative's contractual duty to indemnify and hold the Met harmless; and "[c]ertificates of such insurance shall be filed with [the Met] prior to the commencement of" the construction project.

Importantly, Exhibit D, entitled "Insurance Requirements," fleshes out Strauss/Creative's insurance obligations. This contract document requires Strauss/Creative to procure three types of insurance: (1) workers' compensation insurance (paragraph [a]); (2) owners and contractors protective liability (OCP) insurance with a combined single limit of $5 million (paragraph [b]); and (3) comprehensive general liability (CGL) insurance, with combined coverage for property and bodily injury with a minimum single limit of $5 million, which might be met by umbrella coverage (paragraph [c]). As relevant to this appeal, paragraph (b) of Exhibit D, after identifying OCP coverage as an insurance requirement, specifies that "[l]iability should add [the Met] as an additional insured and should include contractual liability and completed operations coverage"; paragraph (e) directs Strauss to "furnish the Met [with] an Original Owners and Contractors policy," and also to "provide certificates of insurance for the [Workers'] Compensation, the [CGL] and the 'Umbrella' Policy, prior to the commencement of the contract."

The contract was signed on behalf of the Met as "OWNER" by the opera house's manager, and on behalf of Strauss as "CONTRACTOR" by Ralph Drewes (Drewes) as "VP".[1]  Strauss and Creative, although separately owned, shared the same address and some of the same employees.[2]  At his deposition, Drewes testified that he ran the day-to-day operations of both companies, and reported to both Victor Strauss, the owner and president of Strauss, and Hillary J. Klein, the owner and president of Creative.  Strauss did not have an agreement with District Council 9, the painters' union, while Creative did, and the contract between Strauss/Creative and the Met required the construction project to be carried out by "fully insured union painters."  For this reason, Strauss subcontracted the labor to Creative by agreement dated September 3, 2008, consisting of an unaltered standard form contract with an agreed-upon rider and

---

[1]In other words, although the first page of the contract designates Strauss/Creative as "the Contractor," Drewes executed the contract on a signature line identifying only Strauss as "CONTRACTOR" (see Mayo v Metropolitan Opera Assn., Inc., 108 AD3d 422, 424 [1st Dept 2013] [concluding, in the Met's third-party action against Strauss, Creative and Nova Casualty Company (Nova), Creative's CGL insurer, that an issue of fact exists with respect to whether Drewes had authority or intent to bind Creative to the contract]).  Throughout this opinion, we have generally identified "Strauss/Creative" as the contractor because this is what the contract's first page says.  We do not intend thereby to imply that Creative is bound to the contract, an issue which has yet to be resolved.  But, of course, whether or not Creative is bound to the contract, Strauss surely is.

[2]In its corporate disclosure statement filed in this Court, Strauss identifies Creative as an "affiliated corporation."

attachments, and the underlying construction contract between Strauss/Creative and the Met (hereafter, the subcontract).

The subcontract designates Strauss as "the Contractor" and Creative as "the Subcontractor," and generally requires Creative to undertake the construction project in accordance with the terms of the contract, and to provide specified insurance and indemnify and hold harmless the Met and/or Strauss.  The subcontract makes Creative solely responsible for worksite safety.  Victor Strauss signed the subcontract on behalf of Strauss; Drewes testified that he "believe[d] that [he] signed it on behalf of Creative."[3]

Creative began work on the construction project on September 4, 2008.  At some point, the Met was supplied with a certificate of insurance for a CGL policy issued by Nova to Creative, stating that the Met and Strauss were additional insureds under the policy.[4]  The Met was never furnished an original OCP policy covering the construction project, and, as it turned out, neither Strauss nor Creative actually purchased an OCP policy to protect the Met.

<u>Strauss's CGL Policy with Mt. Hawley</u>

At the time Strauss/Creative contracted with the Met,

---

[3]The subcontract bears the handwritten signature "Hillary J. Klein" with Drewes's initials.

[4]The record does not include a copy of this policy, or of the certificate of insurance.

Strauss had in place a CGL policy issued by Mt. Hawley Insurance Company (Mt. Hawley) for the policy period of November 7, 2007 to November 7, 2008.  The policy included ISO form endorsement CG 20 33 07 04 ("Additional Insured -- Owners, Lessees or Contractors -- Automatic Status When Required in Construction Agreement with You"), which specifies as follows:

> "WHO IS AN INSURED is amended to include as an additional insured any person or organization for whom [Strauss is] performing operations <u>when [Strauss] and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on [Strauss's] policy</u>" (emphasis added).

Under the policy, "such person or organization" would be an additional insured with respect to liability for bodily injury so long as the injury was caused, at least in part, by Strauss's acts or omissions or "[t]he acts or omissions of those acting on [Strauss's] behalf."

Regarding notice, the policy specifies that bodily injury "will be deemed to have been known to have occurred at the earliest time when any insured listed under . . . WHO IS AN INSURED or any employee authorized by [an insured] to give or receive notice of an occurrence or claim . . . [b]ecomes aware . . . that bodily injury . . . has occurred or has begun to occur" (internal quotation marks omitted).  Further, the insured "must see to it that [Mt. Hawley is] notified as soon as practicable of an occurrence or an offense which may result in a claim" (internal quotation marks omitted).

### The Accident, the Personal Injury Lawsuit and Notice to the Insurers

On September 16, 2008, Manuel Mayo (Mayo), a Creative employee, was injured when he fell from a fixed ladder located on the sixth floor of the opera house. This 15-foot ladder led to a hatch door in the ceiling, which provided access to the rooftop and thus the steel carriage track. Mayo was trying to close the hatch door at the end of his shift when he lost his footing. Drewes first learned of Mayo's accident when the receptionist/office manager at Creative's office fielded a telephone call late in the workday on September 16th from someone at the opera house. The caller (not identified in the record) reported that Mayo had been injured and was being transported to the hospital by ambulance. Drewes happened to be in the office at the time the call was received.

The next day Drewes called his "primary contact" at I. Dachs & Sons (Dachs), the insurance broker for both Creative and Strauss, to discuss upcoming liability insurance renewals. During this conversation, Drewes brought up Mayo's accident, and was "[led] to believe by [the broker] that there was no need to notify the carrier, the general liability carrier, because it was a workers' compensation claim."

Creative timely filed an "Employer's Report of Work-Related Accident/Occupational Disease" (Form C-2) to notify the Workers' Compensation Board and Creative's compensation carrier about Mayo's accident. "A couple of days later" or perhaps "a

week after" Mayo's accident while Drewes was at the opera house to check on how the construction project was coming along, he mentioned to the Met's house manager that "[t]here was an accident, the man was hurt and he [i.e., Drewes] expected him [i.e., Mayo, the injured worker] to come back to work, [and] at that point it was a worker's comp claim".[5]

By complaint dated November 19, 2008, Mayo and his wife sued the Met and Lincoln Center for the Performing Arts, Inc. (Lincoln Center), asserting causes of action for negligence, violations of the Labor Law and loss of consortium in connection with Mayo's work-related injuries (hereafter, the Mayo lawsuit). Mayo alleged that the hatch door was broken and in disrepair, the ladder's rungs were worn and not skid-resistant, and there were no proper safety devices such as a cage, safety belt or safety line. The Met received the summons and complaint in the Mayo lawsuit from the Secretary of State on December 5, 2008.

That same day, the Met's in-house attorney wrote to Strauss and Creative, with a copy to Travelers Insurance Company (Travelers), the Met's primary liability carrier, forwarding the summons and complaint. The attorney advised Strauss that the Met expected to be indemnified and held harmless to the fullest extent permitted by law, as agreed-to by Strauss in the contract.

_____

[5]Deposition testimony included in the record, although incomplete, makes clear that the Met's house manager, assistant director of security and an in-house nurse knew about Mayo's accident just after it occurred.

This December 5th letter also referred to the certificate of insurance provided the Met, which "evidenc[ed] General Liability coverage of $1,000,000 per occurrence/$2,000,000 aggregate from [Nova] and Excess/Umbrella Liability coverage issue[d] by RSUI Indemnity Co. in the amount of $5,000,000 per occurrence and in the aggregate."  Asserting that the Met was an additional insured under these policies, the attorney asked Strauss to "immediately notify these carriers that the Met expect[ed] them to provide, without cost to the Met, a defense in this lawsuit, as well as indemnification."  On December 11, 2008, the Met received another copy of the summons and complaint by mail, this time from the Mayos' lawyer.  The Met's in-house attorney again wrote Strauss and Creative, with a copy to Travelers, forwarding the summons and complaint and requesting that "the necessary actions" be taken.

On December 29, 2008, a representative of Travelers wrote to Strauss, Creative, Nova and Dachs.  She stated that Travelers was the general liability insurer for the Met and Lincoln Center, and that Travelers had received a complaint alleging that Mayo had been injured while working for Creative at the opera house; she then recited Strauss's obligation under the contract to indemnify and hold the Met harmless from claims such as the Mayo lawsuit, and to "procure insurance naming [the Met] as an additional insured."  The Travelers representative enclosed copies of the lawsuit, contract and certificate of insurance, and

asked for written confirmation that "a defense and indemnification will be provided, and [for] the identity of counsel assigned to the defense."  On January 12, 2009, Mt. Hawley's broker received notice of the Met's claim (including a copy of Travelers' December 29th letter) from Dachs.  Mt. Hawley's broker then faxed the Met's claim to Mt. Hawley, which acknowledged receipt on January 14, 2009.

### Mt. Hawley's Response to Strauss's and the Met's Tenders and the Met's Third-Party Action

On February 3, 2009, Mt. Hawley wrote to Strauss to deny coverage on the basis of late notice because Strauss "was aware of this occurrence on the date it occurred[,] which was September 16, 2008;" and to inform Strauss that Mt. Hawley was "reviewing the information as to whether [the Met] and/or [Lincoln Center] qualify as additional insureds under the terms of [the] policy."  Finally, Mt. Hawley let Strauss know that it had tendered the defense of the Mayo lawsuit to Nova on its behalf; i.e., by letter dated February 2, 2009, with copies to Drewes and Dachs, Mt. Hawley asked Nova to defend and indemnify the Met and Lincoln Center in the Mayo lawsuit, and to defend and indemnify Strauss in any third-party action brought by the Met and Lincoln Center.

In a letter to Travelers, also dated February 3, 2009, Mt. Hawley first observed that the contract between the Met and Strauss/Creative nowhere stated that Lincoln Center was to be indemnified or made an additional insured under any policy issued

to Strauss and/or Creative.  Accordingly, Mt. Hawley denied

Travelers' tender as to Lincoln Center.[6]  Mt. Hawley continued

that it was "attempting to determine" whether the Met qualified

as an additional insured under the terms of its CGL policy with

Strauss.

Referring to the C-2, which showed that Mayo was

employed by Creative, Mt. Hawley requested "copies of checks that

[the Met] issued for payment of the work required in the

contract," adding that "[i]t [was] questionable as to whether

[Strauss] was actually involved in this work."  Mt. Hawley noted

that, in light of the additional insured endorsement in its CGL

policy with Strauss, "we need to determine whether [Strauss] was

actually involved in this work in order to determine whether [the

Met] is added as an additional insured"; and that "[a]t this

point in time, [Mt. Hawley] reserves the right to assert that

[the Met] is not an additional insured under the Policy . . .

issued to [Strauss; h]owever, we continue to ask for more

information and it may take further discovery to determine our

obligations."  Summing up, Mt. Hawley told Travelers that

> "[a]s we have denied coverage for contractual
> indemnification to [Strauss] and have reserved our
> rights as to whether [the Met] is an additional insured
> under the policy issued to [Strauss], we will not be

---

[6]The December 29th letter from Travelers did not purport to
ask Mt. Hawley to defend and indemnify Lincoln Center, the Met's
landlord.  Lincoln Center, the organization (as opposed to
Lincoln Center, the Met's address) is not mentioned in either the
contract or the subcontract.

taking over the defense and/or indemnification of [the Met] at this time.  As stated above, we have denied coverage for contractual indemnification as to [Lincoln Center]."

On March 4, 2009, Mt. Hawley again wrote Travelers, this time stating that the information requested in the February 3rd letter (i.e., copies of checks issued by the Met to Strauss to pay for the construction project) had not been received, and that its "investigation [had] yielded information that [the Met] was aware of this loss on the date it occurred [since (a)pparently [the Met] contacted [Drewes] at [Strauss] to inform him of the accident."  Mt. Hawley added that "[s]hould the information that we have been provided be correct, no coverage would apply to [the Met] in this lawsuit," and requested an affidavit as to when the Met "first became aware" of Mayo's accident.  Mt. Hawley further declared that "[u]ntil such time as we can review the affidavit being provided, [Mt. Hawley] reserves the right to assert that no coverage would apply based on" the CGL policy's notice provision.  Both the Met and Lincoln Center are shown as copied on this letter.  That same day, March 4, 2009, Mt. Hawley wrote to Strauss's attorney, reiterating its denial of coverage to Strauss on the ground of late notice.

Meanwhile, on January 28, 2009, Nova responded to Travelers' December 29th letter by disclaiming coverage of the Met as an additional insured on Creative's CGL policy due to late notice (see Mayo v Metropolitan Opera Assn., Inc., 2011 NY Slip Op 32943[U], *12 [Sup Ct, NY County 2011]).  The Met was not

copied on this disclaimer letter sent to Travelers.

On February 6, 2009, the Met brought a third-party action in the Mayo lawsuit against Strauss, Creative and Nova. The Met alleged causes of action against Strauss and Creative for common-law and contractual indemnification, and for breach of contract for failure to purchase the OCP policy required by Exhibit D of the contract, and alleged a cause of action against Nova for breach of contract for denying coverage.

### Strauss's Lawsuit against Mt. Hawley and the Met and the Decisions Below

By complaint filed on March 16, 2009, Strauss commenced this action against Mt. Hawley and the Met, seeking a declaration that Mt. Hawley was obligated to defend and indemnify it in the Met's then just-filed third-party action. On June 16, 2010, 15 months later, the Met cross-claimed against Mt. Hawley, asking in its first cross-claim for a declaration that it was an additional insured on Strauss's CGL policy, thereby requiring Mt. Hawley to defend and indemnify it in the Mayo litigation; on July 9, 2010, the Met moved for summary judgment on this cross-claim. On July 14, 2010, Mt. Hawley moved to dismiss the Met's cross-claims as untimely, and on July 30, 2010, Mt. Hawley cross-moved for summary judgment against the Met, seeking a declaration that it was not obligated to defend and indemnify the Met in the Mayo lawsuit. Then on July 26, 2010, Mt. Hawley moved for an order granting summary judgment to dismiss Strauss's complaint and to declare that it was not obligated to defend and indemnify Strauss

in the Mayo lawsuit.[7]

Supreme Court disposed of these motions and cross-motion in a decision and order dated October 13, 2011 (2011 NY Slip Op 32706[U] [Sup Ct, NY County 2011]).  Addressing the Met's motion and Mt. Hawley's cross-motion, the judge determined that the Met was an additional insured on Strauss's CGL policy, and that while the Met's three-month (counting from the date of the lawsuit) or four-month (counting from the date of the accident) delay in notifying Mt. Hawley was unreasonable as a matter of law, Mt. Hawley did not comply with its statutory duty under Insurance Law former § 3420 (d)[8] to promptly disclaim coverage,

_____

[7]The Mayo lawsuit settled on October 16, 2013.  The Met's third-party action, which had previously been severed from the underlying personal injury lawsuit, remains pending.  According to the Met's counsel, the settlement "preserved the third-party actions and all insurance coverage and contractual indemnity rights among all of the defendant parties and their carriers."

[8]This provision specified that

    "[i]f under a liability policy delivered or issued for delivery in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant" (Insurance Law former § 3420 [d]).

    In response to our decision in Preserver Ins. Co. v Ryba (10 NY3d 635, 642 [2008] [under Insurance Law former § 3420 (d), a policy is "issued for delivery" in New York only if it "covers both insureds and risks in this state"]), the Legislature struck "issued for delivery" from section 3420 (d), which now covers liability policies that are "issued or delivered in this state"

as the letters from Mt. Hawley to Travelers and/or the Met only reserved Mt. Hawley's right to do so.  Consequently, the judge ruled that Mt. Hawley was precluded from disclaiming coverage to the Met.  Relatedly, Supreme Court denied Mt. Hawley's motion to dismiss the Met's cross-claim due to untimeliness, chalking up any delay to Mt. Hawley's neglect to disclaim coverage promptly; and dismissed Strauss's complaint against Mt. Hawley on the basis of its late notice to Mt. Hawley of Mayo's accident.

In its decision and order dated April 11, 2013, the Appellate Division agreed with Supreme Court that Mt. Hawley was required to defend the Met in the Mayo lawsuit because the contract directed Strauss to purchase liability insurance naming the Met as an additional insured, and the CGL policy issued by Mt. Hawley to Strauss contained an additional insured endorsement (105 AD3d 512, 513 [1st Dept 2013]).  The court also agreed with Supreme Court that Mt. Hawley had not timely disclaimed coverage; rather, its letters were only "intended to preserve its right to disclaim," and thus were "insufficient to actually disclaim coverage" (id.).  Finally, the Appellate Division rejected Strauss's claim that its notice to Mt. Hawley was timely, opining that

---

(see Insurance Law § 3420 [d] [2]; see also L 2008, ch 388 [eff. Jan. 19, 2009 for policies issued or delivered in New York on or after that date and any action maintained under such a policy]).

"[Strauss's] notice of the accident to Mt. Hawley was untimely as a matter of law, and Mt. Hawley timely disclaimed coverage on that ground. [Strauss's] notice to its broker did not provide timely notice to Mt. Hawley.  There is no indication that [Strauss's] broker acted as an agent for Mt. Hawley or that the CGL policy listed [Strauss's] broker as its agent" (id. at 514).

Strauss now appeals and Mt. Hawley cross-appeals pursuant to leave granted by the Appellate Division on August 20, 2013, asking us whether its order in this matter was properly made (2013 NY Slip Op 82536[U] [1st Dept 2013]).

II.

In this long-running coverage dispute, Strauss's appeal calls upon us to decide whether Strauss timely notified Mt. Hawley of Mayo's accident.  Mt. Hawley's cross-appeal poses the threshold question of whether the Met is an additional insured on Strauss's CGL policy with Mt. Hawley; and then, if it is, whether Mt. Hawley promptly notified the Met that it was disclaiming coverage on account of untimely notice.

<u>Strauss's Appeal</u>

Strauss argues that the lower courts erred when they concluded that its notice to Mt. Hawley was untimely as a matter of law.  Relying on <u>Mighty Midgets v Centennial Ins. Co.</u> (47 NY2d 12 [1979]), Strauss takes the position that whether it gave notice to Mt. Hawley "as soon as practicable" or, alternatively, whether its late notice was excusable are questions for the trier of fact and may not be decided as a matter of law.  This is so, Strauss contends, because Drewes followed his usual and customary

practice of promptly notifying Dachs, Strauss's broker, of Mayo's accident, with every reasonable expectation that Dachs, in turn, would timely notify the proper insurer.

We have long held that a policyholder's timely notice to a broker does not "constitute the notice contemplated by the [insurance] policy since a broker is normally the agent of the insured and notice to the ordinary insurance broker is not notice to the liability carrier" (Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp. 31 NY2d 436, 442 n 3 [1972]; see also Hartford Fire Ins. Co. v Baseball Off. of Commr., 236 AD2d 334 [1st Dept 1997] [late notice was not excused even though the policyholders "instructed their broker to inform (the primary and excess insurers) about the lawsuit shortly after its commencement"], lv denied 90 NY2d 803 [1997]; Gershow Recycling Corp. v Transcontinental Ins. Co., 22 AD3d 460, 462 [2d Dept 2005] [a policyholder's "timely notice of the action to its broker is of no consequence" and thus does not excuse the failure to comply with notice obligations under an insurance policy]). Our decision in Mighty Midgets does not alter this fundamental principle.

Mighty Midgets was a nonprofit corporation organized to encourage, manage and otherwise support boys' football teams in Orangetown in Rockland County. The Dunn & Fowler Division of Frank B. Hall & Company (Dunn) secured two insurance policies for the Orangetown Midgets: a liability policy from Centennial

Insurance Company (Centennial) and a policy providing accident
and health protection with the Hartford Accident & Indemnity
Company (the Hartford).  We described Dunn as "a leading
specialist in athletic team insurance and apparently the
organization upon which the more than 2,500 teams enrolled in the
national program of which the Midgets were a part would rely for
guidance in insurance matters" (Mighty Midgets, 47 NY2d at 17)

The roles of Dunn and Centennial were uncommonly
intertwined; specifically, in addition to being the solicitor of
liability policies with Centennial, Dunn collected the premiums
and was designated by the policy as "agent or broker."  Dunn
wrote most of its athletic team business with Centennial, which
entrusted Dunn with large batches of blank policies already
executed by Centennial-authorized signatures, leaving it
completely up to Dunn to fill in policy numbers, names of
insureds, premiums and the date a policy was to go into effect.

On October 18, 1970, a nine-year-old boy, a member of a
Midgets-sponsored team, was injured when, right after a game in
which he had played, a large pot of boiling water which rested on
the counter of an improvised hotdog stand operated by the Midgets
as a fundraising activity, was "caused to pour over him" (id.).
Robert Halle (Halle), the 21-year-old volunteer president of the
Midgets was not present at the time, but he learned of the
accident before the day was out and called Dunn to ask "whether
he should 'put it under a medical or [a] liability claim'" (id.).

The Dunn representative instructed Halle to notify the Hartford, and Halle dutifully filed a claim with the Hartford, on a form supplied by Dunn.

Then on April 7, 1971, the Hartford notified the Midgets that its policy did not cover the accident because it happened after the game in which the nine-year old had played. Although the nine-year old's father, "an avid supporter of the Midgets," had never before exhibited the slightest inclination to pursue a liability claim, the Hartford's refusal to pay his son's medical claim caused him to consult a lawyer, who wrote the Midgets a letter dated May 25, 1971, indicating that a liability suit was "in the offing" (id. at 18).  Halle immediately forwarded the lawyer's letter to Centennial in care of Dunn. This was the Midgets' first written notice to Centennial.  The liability policy required notice of an occurrence to be made to the insurer in writing and "as soon as practicable."  In light of the seven-month delay, Centennial disclaimed coverage due to untimely notice, and the Midgets brought a declaratory judgment action.

On this record, the trial judge, sitting without a jury, found as a fact

> "(1) that Dunn's handling of the communications from Halle was negligent; (2) that 'under the circumstances', including Halle's 'limited . . . understanding of insurance matters' and the relationship between Dunn and Centennial, the Midgets acted reasonably in that they did all that they 'could do' until the arrival of the letter of May 25 first disabused them of the misinformation Dunn had imparted;

> and (3) that the letter transmitting the . . . lawyer's liability claim letter constituted written notice given 'as soon as practicable' after the claim was made" (id. at 18-19 [internal footnote omitted]).

The Appellate Division affirmed, with two Justices dissenting (62 AD2d 1014 [2d Dept 1978]).  There was no disagreement about the facts; the dissenters simply would have held the written notice to be untimely.

Sitting as a six-judge court, we also affirmed, by a margin of four to two.  The dissenters commented that "it [was] especially difficult to conclude that it was not 'practicable' to give notice long before the expiration of seven months when the insured gave the agent oral notice the day after the accident" (47 NY2d at 23 [Jones, J., dissenting]).  The majority ruled, however, that "in the facts and circumstances" presented,

> "there was enough evidence from which it could be found that the Midgets' failure to notify the insurer before it did was not unreasonable and that, consequently, Centennial was not entitled to disclaim.  Since our review is limited to determining whether the conclusion of the fact-finding courts finds support in the evidence, we must uphold their determination" (id. at 16, 21).

Like the lower courts, the "facts and circumstances" that we considered particularly compelling were not just Halle's youth and "limited personal and vocational background[] [which was] totally alien to either the world of insurance or that of the law" (id. at 18), but also the unusually close ties between Centennial and Dunn, which reasonably caused Halle to solicit and blindly follow Dunn's advice.

Here, by contrast, although Dachs may have long been Strauss's insurance broker, nothing in this record reveals the kind of close relationship between Dachs and Mt. Hawley that existed between Dunn (which was also Centennial's agent for receipt of notice of claim) and Centennial.  The record here does not support the proposition that the insurer and broker had a relationship sufficiently close to suggest that service to the broker was effectively service to the insurer.  By contrast, in a situation more akin <u>Mighty Midgets</u> it might be possible for even a relatively sophisticated representative of an insured to have a good faith, reasonable belief that notice to the broker is sufficient if the insurer's own actions hold the broker out to be its agent for the purpose of giving notice. In such a case, if the effect of the insurer's representations is to lull the insured into a false belief that notice had been provided through the agent, the insurer should not be able to raise the insured's failure to provide an earlier notice as a defense to coverage.

Further, it should be noted that Drewes was not an unsophisticated 21-year old like Halle, unusually dependent upon Dunn, the insurance broker, for advice and guidance.  Rather, Drewes was the longtime day-to-day operations manager of two construction contractors in New York City.  Indeed, by virtue of Drewes's experience in the construction industry, it is a wonder that he did not grasp the overwhelming probability that Strauss would be drawn into a Labor Law lawsuit immediately upon learning

that Mayo had suffered an elevation-related injury while on the job.  In short, the outcome in <u>Mighty Midgets</u> turned on unusual and extenuating facts, not remotely comparable to the circumstances of this case.

<u>Mt. Hawley's Cross Appeal</u>

Under the additional insured endorsement of Strauss's CGL policy, whether the Met was an additional insured hinges on whether Strauss and the Met "have agreed in writing in a contract or agreement that [the Met] be added as an additional insured on [Strauss's] policy."  The Met argues that the second sentence of paragraph (b) of the contract's Exhibit D contains the requisite agreement in writing.  Paragraph (b), in its entirety, requires Strauss/Creative to procure the following insurance:

> "b. Owners and contractors protective liability insurance with a combined single limit of $5,000,000.00.  <u>Liability should add the Metropolitan Opera Association as an additional insured and should include contractual liability and completed operations coverage</u>" (emphasis added).

Mt. Hawley counters that paragraph (b) simply reflects the Met's considered choice to require Strauss to purchase OCP coverage to protect the Met from risks arising out of Strauss's work, rather than mandating that Strauss include the Met as an additional insured on its CGL policy.  Mt. Hawley observes that the OCP policy specified in this paragraph would have provided the Met with an unshared $5 million limit; by contrast, as an additional insured on Strauss's CGL, the Met would have to have shared the policy limits with Strauss and any other insureds on

the policy.

We agree with Mt. Hawley that the second sentence in paragraph (b) can only refer to the OCP coverage that Strauss promised to purchase for the Met in the first sentence -- but never actually acquired.  This conclusion is buttressed by paragraph (c) of Exhibit D, which sets out Strauss's insurance commitments to the Met with respect to CGL coverage, stating as follows:

> "Comprehensive General Liability.  Combined coverage for property and bodily injury with a minimum single limit of $5,000,000.00 (Limits may be met with an 'Umbrella Policy'[)]."

Notably, this provision -- the only paragraph in Exhibit D addressing Strauss's insurance obligations with respect to GCL coverage -- says nothing about including the Met as an additional insured on Strauss's CGL policy.  We therefore conclude that the Met is not an additional insured on the CGL policy issued to Strauss by Mt. Hawley.

Finally, because the Met is not an additional insured under Strauss's CGL policy, we do not reach and need not decide the question of whether Mt. Hawley promptly notified the Met that it was disclaiming coverage under that policy due to untimely notice (see Zappone v Home Ins. Co., 55 NY2d 131, 134 [1982] ["failure to disclaim coverage does not create coverage which (a liability) policy was not written to provide"]).

Accordingly, the order of the Appellate Division should be modified, without costs, by denying defendant Metropolitan

Opera Association's motion for summary judgment on its first
cross-claim and, as so modified, affirmed, and the certified
question answered in the negative.

Strauss Painting, Inc. v Mt. Hawley Ins. Co.

No. 203

READ, J. (DISSENTING IN PART):

The second sentence of Exhibit D, paragraph (b) in the September 3, 2008 construction contract (hereafter, the contract) states as follows: "Liability should add the Metropolitan Opera Association as an additional insured and should include contractual liability and completed operations coverage."  While this sentence may be awkwardly phrased and infelicitously placed within Exhibit D,[1] it is not ambiguous in light of the realities

---

[1]Exhibit D, entitled "Insurance Requirements," states in its entirety as follows:

"a. Workmen's Compensation Insurance covering contractors employees meeting all statutory requirements prescribed in New York State.

"b. Owners and contractors protective liability insurance with a combined single limit of $5,000,000.00.  Liability should add the Metropolitan Opera Association as an additional insured and should include contractual liability and completed operations coverage.

"c. Comprehensive General Liability.  Combined coverage for property and bodily injury with a minimum single limit of $5,000,000.00 (Limits may be met with an "Umbrella Policy"[)].

"d. Contractor will supply the Metropolitan Opera Association with a Hold Harmless and indemnify them against any and all claims arising from their work relative to this agreement.

- 1 -

of the insurance marketplace.  Given the differences between owners and contractors protective liability (OCP) and comprehensive general liability (CGL) policies, this sentence clearly obligates Strauss Painting, Inc. (Strauss) to have in place a CGL policy protecting the Metropolitan Opera Association, Inc. (the Met) as an additional insured.  With all due respect to my colleagues, there is simply no other way to read it.  Accordingly, I respectfully dissent from so much of the majority's decision as determined that the Met is not an additional insured on the CGL policy issued by Mt. Hawley to Strauss.  For the reasons that follow, I would therefore answer the certified question in the affirmative.

I.

An OCP policy covers the named insured's liability for bodily injury and property damage caused, in whole or in part, by the designated contractor's work for the insured on a specified construction project.  The contractor purchases the OCP policy, which protects the insured from vicarious liability incurred as a

---

"e. Contractor will furnish the Metropolitan Opera Association an Original Owners Contractor policy.  Also will provide certificates of insurance for the Workman's Compensation, the Comprehensive General Liability and the "Umbrella" Policy, prior to the commencement of the contract.

"f. All insurance policies must contain a clause that insures the Metropolitan Opera Association a 30 day written notification of cancellation or non-renewal of policy."

result of the contractor's acts or omissions on the project, and liability arising out of the insured's own acts or omissions in connection with its "general supervision" of the work performed by the contractor (see generally Donald S. Malecki et al., The Additional Insured Book, International Risk Management Institute [IRMI] at 202-217 [7th ed 2013] [hereafter Malecki]; Craig F. Stanovich, OCP Liability versus Additional Insured Coverage, IRMI [Oct 2009] [hereafter Stanovich 2009], www.irmi.com/expert/articles/2009/stanovich10-cgl-general-liability-insurance.aspx).

Mt. Hawley insists that the second sentence of paragraph (b) obligated Strauss to include the Met as an additional insured on the OCP policy that the first sentence directed Strauss to purchase for the benefit of Lincoln Center. For this reason, Mt. Hawley criticizes the Appellate Division for "failing to recognize the critical distinction between the OCP Policy, on which the Contractor was expressly required to have the Met named as an additional insured, and the CGL Policy, for which no such requirement existed"; and argues that "as the owner of the property, Lincoln Center would have been listed as the owner on any OCP Policy. The Met would have been an additional insured on that policy."[2] This is how Mt. Hawley tries to

---

[2]Apparently, the only ISO (Insurance Services Offices, Inc.) endorsement available for use in adding an additional insured to an OCP policy is the "Additional Insured -- Engineers, Architects or Surveyors (CG 20 31)" endorsement (see Malecki at 214,

explain away the requirement to make the Met an additional insured.

Lincoln Center owns the opera house and is the Met's landlord; however, as Mt. Hawley itself pointed out when responding to Travelers' November 29th letter, Lincoln Center (the entity) is nowhere mentioned in the contract, which identifies the Met as the project owner.  Thus, there is no basis within the four corners of the contract for interpreting paragraph (b) as requiring Strauss to purchase an OCP policy issued in the name of Lincoln Center.  And it is not obvious how such a policy could have been obtained since Lincoln Center was not the party with which Strauss contracted to perform the work.

Next, the second sentence of paragraph (b) states that the policy on which the Met is to be included as an additional insured must provide "contractual liability and completed operations coverage."  "Contractual liability" in this context refers to the liability assumed by Strauss under the contract's hold harmless and indemnification provision, while "completed operations" refers to coverage for injuries or damages occurring <u>after</u> the construction project has been finished.  These coverage

---

Appendix B), which obviously is not relevant here.  In other words, there is no such thing as standard policy language for a lessee who contracts with a contractor for a construction project on the leased premises to become an additional insured on an OCP policy.  This is not surprising since the lessee under such circumstances, as is the case with the Met here, would be the named insured on the policy.

options (i.e., contractual liability and completed operations) are available to an additional insured on a CGL policy; they are not, however, available on an OCP policy (see e.g. Craig F. Stanovich, Contractual Liability and the CGL Policy IRMI [May 2002] [www.irmi.com/expert/articles/2002/stanovich05.aspx?cmd] [explaining how contractual liability insurance, found in the CGL insurance policy, applies]; Stanovich 2009 ["The OCP policy excludes coverage for bodily injury or property damage if such injury or damage takes place after the earlier of when the operation has been completed or put to its intended use by anyone other than another contractor or subcontractor working for the Designated Contractor on that project . . . The ISO CG 20 37 and many insurers' independently filed additional insured endorsements provide coverage for the additional insured for bodily injury or property damage within the product and completed operations hazard.  This coverage option is not available on the OCP policy" [emphasis added]; Malecki at 58-60, 202).  In short, the second sentence of paragraph (b) cannot mean that Strauss was required to purchase an OCP policy with contractual liability and completed operations coverage for the benefit of the Met as an additional insured because no such policy option exists.  This pair of agreed-to coverages could only be provided by including the Met as an additional insured on Strauss's CGL policy.

The Met sought in Exhibit D to transfer or shift to Strauss in every way possible the risk of financial loss due to

bodily injuries or property damages occurring in connection with the construction project by requiring Strauss to have in place (1) workers' compensation insurance; (2) an OCP policy in favor of the Met as the named insured; (3) a contractual hold harmless and indemnification provision whereby Strauss assumed the Met's tort liability arising out of construction operations; and (4) a CGL policy including the Met as an additional insured, which provided for contractual liability and completed operations coverage.

Known as the "belt and suspenders" approach, adding an indemnitee (here, the Met) as an additional insured on the indemnitor's (here, Strauss's) liability insurance gives "some protection to fall back on in the event there is a problem with the enforceability of the hold harmless agreement" (id. at 59-60, 69 ["(M)ost contractual risk transfers . . . involve using both an indemnity clause and additional insured status to work hand-in-hand"]; see also The Handbook on Additional Insureds, American Bar Association, at 38-39 [Michael Menapace et al. ed. 2012] ["There are multiple reasons for a party to insist on both indemnification provisions and insurance requirements in a single contract . . . (T)he protection afforded by indemnification and hold harmless provisions, on the one hand, and additional insured coverage, on the other, are in many instances complimentary (sic) and not co-extensive.  Thus, to maximize one's protection, a party should include in the contract both an indemnification and

hold harmless requirement and an additional insured requirement"]).  Further, "[i]n the construction industry, general contractors and project owners who seek additional insured protection often will insist upon receiving [ISO endorsements allowing] coverage for both ongoing operations and completed operations" (id. at 51).

As Mt. Hawley points out, an OCP policy may be an alternative to adding the owner as an additional insured to the contractor's CGL policy.  But while there are advantages and disadvantages to each approach (see generally Malecki at 214-217), an OCP policy and additional insured status are not, as Mt. Hawley implies, mutually exclusive.  Indeed, "[i]t is not unusual for an indemnitee to request both an OCP policy and additional insured status in the expectation that one of the coverages will apply in the event of a claim or suit" (id., at 216).  Nothing (except perhaps cost and/or relative bargaining power) prevents a project owner from seeking to avail itself of the complementary advantages of both coverages, as the Met clearly did in this case.

Finally, Mt. Hawley contends that the Met sought OCP coverage in lieu of additional insured status as part of a "well-reasoned insurance scheme" since "[t]he OCP policy would provide the Met with protection arising out of [Strauss's] work and, more importantly, . . . an unshared $5M limit," whereas, "[a]s an additional insured on [Strauss's] CGL policy, the Met would . . .

share the policy limits with all other insureds on the Policy --
exposing the Met to a wasting of liability limits beyond its
control."  Again, Mt. Hawley assumes that a project owner would
only bargain with its contractor to provide OCP coverage or
additional insured status on the contractor's CGL policy, not
both.  It is certainly true that an OCP policy provides the named
insured a separate set of limits, while CGL policy limits are
shared by all insureds; that is one of the advantages that an OCP
policy offers.  But Mt. Hawley disputes that the Met was the
intended named insured on the OCP policy that Strauss agreed but
failed to purchase; therefore, under Mt. Hawley's interpretation
of Exhibit D, paragraph (b), the Met would not, in fact, have
enjoyed the benefit of the unshared limits that Mt. Hawley
contradictorily also claims motivated the Met to choose coverage
under an OCP policy rather than additional insured status under
Strauss's CGL policy.

                              II.

        Because I conclude that the Met was an additional
insured on Strauss's CGL policy, I reach the issue of whether Mt.
Hawley promptly notified the Met that it was disclaiming coverage
on account of untimely notice (see Insurance Law former § 3420
[d] [an insurer wishing to deny coverage on account of late
notice "shall give written notice as soon as is reasonably
possible of such disclaimer of liability and denial of coverage
to the insured and the injured person or any other claimant"]).

On February 3, 2009 Mt. Hawley stated, in a letter sent to Travelers, that it was attempting to determine whether the Met qualified as an additional insured under the policy.[3] The word "disclaim" does not appear in this letter, and the word "denial" shows up only in the context of Strauss or the non-party Lincoln Center. As to the Met, Mt. Hawley advised Travelers that "we need to determine whether Strauss Painting was actually involved in this work in order to determine whether [the Met] is an additional insured. At this point in time, [Mt. Hawley] reserves the right to assert that [the Met] is not an additional insured." In its letter to Travelers dated March 4, 2009, with a copy to the Met, Mt. Hawley stated that it was investigating how early the Met was aware of the Mayo incident. While this letter recited the policy's notice conditions, it merely cautioned, in the conditional tense, that "[s]hould the information that we have been provided be correct, no coverage would apply" to the Met (emphases added).

In sum, the two letters constituted ineffective notice because they did not disclaim coverage; instead, they reserved the right to disclaim coverage in the future (see Hartford Ins. Co. v. County of Nassau, 46 NY2d 1028 [1979] ["A reservation of rights letter has no relevance to the question whether the

---

[3] In this case, the Met did not raise the issue of whether an insurer may validly disclaim coverage by sending written notice to the insured's own carrier only (see Juan Sierra v 4401 Sunset Park, LLC, __ NY3d __ [2014] [decided today]).

insurer has timely sent a notice of disclaimer of liability or denial of coverage"]; <u>Norfolk & Dedham Mut. Fire Ins. Co. v. Petrizzi</u>, 121 AD2d 276 [1st Dept 1986] ["A letter from an insurance company to its policyholders which contains a reservation of the insurance company's rights to disclaim coverage under its policy is not such a notice of disclaimer as to satisfy the requirements of the Insurance Law"]).  Because Mt. Hawley never disclaimed for late notice, it waived the late notice defense (<u>see</u> <u>Hartford Ins.</u> at 1029 ["A failure by the insurer to give such notice as soon as it is reasonably possible after it first learns of the accident or of grounds for disclaimer of liability or denial of coverage, precludes effective disclaimer or denial"]).

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order modified, without costs, by denying Metropolitan Opera Association Inc.'s motion for summary judgment on its first cross claim and, as so modified, affirmed, and certified question answered in the negative.  Opinion Per Curiam.  Judges Graffeo, Smith, Pigott, Rivera and Abdus-Salaam concur.  Judge Read dissents in part in an opinion in which Chief Judge Lippman concurs.

Decided November 24, 2014